

Peter R. Afrasiabi (Bar No. 193336)
pafrasiabi@onellp.com
Nate L. Dilger (Bar No.196203)
ndilger@onellp.com
**ONE LLP**
535 Anton Boulevard, Suite 850
Costa Mesa, California 92626
Telephone:  (714) 434-8750
Facsimile:    (714) 434-8756

Attorneys for Plaintiff Network Signatures, Inc.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| NETWORK SIGNATURES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ACE HARDWARE CORPORATION, a Delaware corporation,<br><br>Defendant. | Case No.  **SACV09-01332 AG (ANx)**<br><br>**COMPLAINT FOR PATENT INFRINGEMENT, PERMANENT INJUNCTION AND DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

For its Complaint against Defendant Ace Hardware Corporation("Defendant"), Plaintiff Network Signatures, Inc. ("Network Signatures") alleges as follows:

## THE NAVAL RESEARCH LABORATORY

1.     The Naval Research Laboratory ("NRL") is one of the most accomplished research-and-development organizations in the country.  NRL scientists have not only made remarkable breakthroughs in military technology, they have literally changed the world for all of us.  Without their efforts, we would not have GPS, modern radar, and any number of other technological innovations that we now take for granted.  This lawsuit concerns another such innovation: technology that allows for the safe and secure communication of sensitive information via the Internet, such as personal, banking, commercial, financial, and other information.

15487.1

2.      Federal law empowers the government to license its patents to private parties for commercialization as well as for enforcement of the patent without the United States as a party. 37 C.F.R. § 404.5(b)(2). By doing so, the government can use market forces to better capitalize on its technologies the way a private party would. In addition, a license agreement can give the private licensee the proper incentives to protect the government's intellectual property from theft, a task often handled better by a private entity.

## THE PARTIES

3.      Plaintiff Network Signatures, Inc. ("Network Signatures") is a corporation duly organized and existing under the laws of Delaware with its principal place of business 30021 Tomas Street, Suite 300, Rancho Santa Margarita, California 92688. As alleged below, the United States of America has granted to Network Signatures an exclusive license concerning the patented technology at issue in this lawsuit.

4.      Defendant is a corporation duly organized and existing under the laws of the Delaware, with its principal place of business at 2200 Kensington Court, Oak Brook, Illinois, 60523. Defendant is in the business of providing retail products and services to persons in the U.S. and worldwide through physical and electronic channels, including the Internet.

## JURISDICTION AND VENUE

5.      This is a civil action for patent infringement arising under the Patent Act of the United States, 35 U.S.C. §§ 1 et seq. This court has subject matter jurisdiction of such federal question claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      Venue is proper under 28 U.S.C. §§ 1391(b), 1391(c) and 1400(b) in that the acts and transactions complained of herein were conceived, carried out, made effective, and had effect within the State of California and within this district, among other places. Defendant resides in this judicial district by virtue of its business activities in this district, have committed acts of infringement in this judicial district, or have committed acts of contributory infringement and inducement of infringement within this judicial district.

15487.1

2

**COMPLAINT**

## NETWORK SIGNATURES LICENSES THE NAVY'S TECHNOLOGY

7.    On April 23, 1996, the United States Patent & Trademark Office duly and legally issued United States Letters Patent No. 5,511,122 ("the '122 Patent"), entitled "Intermediate Network Authentication."

8..    The '122 patent claims, among other things, a critical method of authenticating a computer in which a private electronic key is used, together with a validating public electronic key, to create a cryptographic signature, the cryptographic signature is transmitted in at least one packet to the validating computer, and the signature is verified by the validating computer using its private key and the public key of the computer to be authenticated.  This authentication method allows for the safe and secure communication of sensitive information, such as personal, banking, commercial, financial, and other information, as is transmitted between computers by Defendant and its customers, vendors and users herein.

9.    The '122 Patent is owned by the United States of America, as represented by the Secretary of the Navy.  To allow enforcement, commercialization of and protection of this patent and the technology it represents, in September 2004, the United States Navy executed an exclusive license agreement with Metrix Services, Inc. ("Exclusive License Agreement") and, by this Exclusive License Agreement, expressly granted Metrix Services the exclusive right to practice, enforce, and sublicense, among other rights, the '122 Patent, subject to the general limitations imposed by federal law.  A true and correct copy of the Exclusive License Agreement is attached hereto as Exhibit A and incorporated herein by reference.  With the express approval of the United States Navy, Metrix Services transferred its entire right, title, and interest to, and in, the '122 Patent to Network Signatures on February 14, 2006.  A true and correct copy of the First Amendment to the Exclusive License Agreement, which, among other things, approved the assignment of the Exclusive License Agreement to Network Signatures, is attached hereto as Exhibit B and incorporated herein by reference.  A true and correct copy of the Assignment from Metrix to Network Signatures is attached as Exhibit C and incorporated herein by reference.

15487.1

10.    Pursuant to its rights under the Exclusive License Agreement, Network Signatures has begun the commercial development of a product, known as EasyConnect, that utilizes the '122 Patent.  Network Signatures has demonstrated the product to NRL personnel and has received NRL's recognition of its development efforts.  A true and correct copy of an October 12, 2006, letter from the Navy to Network Signatures reflects this and is attached as Exhibit D and incorporated by reference herein.

11.    Network Signatures has also begun exercising its other primary obligation under the Exclusive License Agreement: protecting the Navy's intellectual property rights from infringement.

## FIRST CLAIM FOR RELIEF
## AGAINST DEFENDANT FOR DIRECT, CONTRIBUTORY AND INDUCING INFRINGEMENT OF U.S. PATENT NO. 5,511,122

12.    Plaintiff incorporates herein by reference the allegations set forth in paragraphs 1-11 of the Complaint as though fully set forth herein.

13.    A true and correct copy of the '122 Patent is attached as Exhibit E and incorporated herein by reference.  On information and belief, Defendant uses digital certificates and digital signatures implemented though the use of public key infrastructure to facilitate communication with its employees and customers.  For example, Defendant enables a computer of a Defendant customer, affiliate, business partner, or employee ("sending computer") to send a secure communication over the Internet to another computer ("receiving computer") by using a confidential private key, and a public key, to digitally sign the message being sent.  When the receiving computer receives the signed message, it uses the sending computer's public key, and its private key, to decrypt the signature (collectively referred to as "Defendant Authentication Activities").

14.    By making, using, selling, and offering for sale Defendant Authentication Activities, Defendant has directly infringed and continues to directly infringe the '122 Patent, including infringement under 35 U.S.C. § 271(a) and (f).

15487.1

4
**COMPLAINT**

15. On information and belief, Defendant has also indirectly infringed and continues to indirectly infringe the '122 Patent by actively inducing direct infringement by other persons—specifically, customers, vendors and partners of Defendant—who operate methods that embody or otherwise practice one or more of the claims of the '122 Patent when Defendant had knowledge of the '122 Patent and knew or should have known that their actions would induce direct infringement by others and intended that their actions would induce direct infringement by others.

16. On information and belief, Defendant has also indirectly infringed and continues to indirectly infringe the '122 Patent by contributory infringement by providing non-staple articles of commerce to others for use in an infringing system or method with knowledge of the '122 Patent and knowledge that these non-staple articles of commerce are used as a material part of the claimed invention of the '122 Patent.

17. On information and belief, Defendant's foregoing acts of infringement include infringement by use and implementation of the Defendant Authentication Activities which are made part of their retail products and services.

18. On information and belief, Defendant will continue to infringe the '122 Patent unless enjoined by this Court.

19. On information and belief, Defendant's infringement of the '122 Patent is, has been, and continues to be willful and deliberate.

20. As a direct and proximate result of Defendant's infringement of the '122 Patent, Network Signatures and the United States Government have been and continue to be damaged in an amount yet to be determined.

21. Unless a preliminary and permanent injunction are issued enjoining Defendant and its officers, agents, servants and employees, and all others acting on their behalf or in concert with Defendant, from infringing the '122 Patent, Network Signatures, and the United States Government, will be greatly and irreparably harmed.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Network Signatures prays for judgment against Defendant as follows:

(1)    For a judicial determination and declaration that Defendant has directly infringed, and continues to directly infringe, United States Letters Patent No. 5,511,122;

(2)    For a judicial determination and declaration that Defendant has induced, and continues to induce, the infringement of United States Letters Patent No. 5,511,122;

(3)    For a judicial determination and declaration that Defendant has contributorily infringed, and continues to contributorily infringe, United States Letters Patent No. 5,511,122;

(4)    For a judicial determination and decree that Defendant's infringement of United States Letters Patent No. 5,511,122 has been, and continues to be, willful and deliberate;

(5)    For a judicial determination and decree that Defendant, its respective subsidiaries, officers, agents, servants, employees, licensees, and all other persons or entities acting or attempting to act in active concert or participation with it or acting on its behalf, be preliminarily and permanently enjoined from further infringement of the '122 Patent;

(6)    For a declaration that Defendant notify all of its customers, vendors and users of the infringing system and customers' participation in the infringement with Defendant's encouragement, and that Defendant encourage its customers, vendors and users to cease all such infringing actions;

(7)    For a judicial decree that orders Defendant to account for and pay to Network Signatures all damages caused to Network Signatures by reason of Defendant's infringement pursuant to 35 U.S.C. Section 284, including enhanced damages under 35 U.S.C. Section 285;

(8)    For an award of damages according to proof at trial;

1     (8)    For an award of damages according to proof at trial;

2     (9)    For a judicial declaration that this case is exceptional under 35 U.S.C. Section

3 285 and Defendant be ordered to pay Network Signatures' costs, expenses, and reasonable

4 attorney's fees pursuant to 35 U.S.C. Sections 284 and 285;

5     (10)   For a judicial order awarding to Network Signatures pre-judgment and post-

6 judgment interest on the damages caused to it by Defendant's infringement; and

7     (11)   For any such other and further relief as the Court may deem just and proper

8 under the circumstances.

9

10 Dated: November 10 2009       **ONE LLP**

11

12

13          By: _____

14             Nate L. Dilger

14             Attorneys for Plaintiff, Network Signatures, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DEMAND FOR JURY TRIAL

Plaintiff Network Signatures, Inc. hereby demands trial by jury in this action.


Dated:  November 10, 2009          **ONE LLP**


By: _____

Nate A. Duger

Attorneys for Plaintiff, Network Signatures, Inc.

27 September 2004

EXCLUSIVE LICENSE

Between

METRIX SERVICES, INC.

And

UNITED STATES OF AMERICA

As Represented By

THE SECRETARY OF THE NAVY

NRL-LIC-04-23-161

EXHIBIT A

## INDEX

|  |  | Page |
|---|---|---|
| Preamble | | 3 |
| Article I | Definitions | 5 |
| Article II | LICENSE Grant | 8 |
| Article III | LICENSEE's Performance | 9 |
| Article IV | Royalties | 10 |
| Article V. | Patent Marking and Nonendorsement | 13 |
| Article VI | Representation and Warranties | 13 |
| Article VII | Reports | 14 |
| Article VIII | Modification and Termination | 15 |
| Article IX | Notice | 17 |
| Article X | Sublicensing | 18 |
| Article XI | Reservation of Rights | 19 |
| Article XII | Litigation | 20 |

④

## PREAMBLE

This exclusive license (hereinafter called "LICENSE") is made and entered into by and between the United States of America as represented by the Secretary of the Navy (hereinafter called "LICENSOR") and Matrix Services, Inc., a corporation organized and existing under the laws of the State of California (hereinafter called "LICENSEE") having an address at 2 Peters Canyon, Irvine, CA 92606.

WITNESSETH:

WHEREAS Title 35 of the United States Code, Section 207, authorizes Federal agencies to license their patents; and

WHEREAS Title 37 of the Code of Federal Regulations, Chapter IV, Part 404 entitled "Licensing of Government Owned Inventions" sets forth the terms and conditions under which licenses may be granted; and

WHEREAS the above-cited authorities provide that licensing of Government inventions will best serve the interests of the Federal Government and the public when utilization of such inventions is promoted and such inventions are brought to Practical Application; and

WHEREAS LICENSOR has an assignment of full right, title, and interest to the invention disclosed and claimed in U.S. Patent No. 5,511,122 issued on April 23, 1996, for "Intermediate Network Authentication"; and

3

⑤

27 September 2004

WHEREAS LICENSOR has published in the Federal Register of December 17, 1996, the availability of a license under U.S. Patent No. 5,511,122; and

WHEREAS LICENSEE has supplied LICENSOR with a plan for development and marketing of this invention and has expressed its intention to carry out this plan upon the granting of this LICENSE; and

WHEREAS LICENSEE has agreed that any products embodying this invention or produced through the use of this invention for use or sale in the United States will be manufactured substantially in the United States; and

WHEREAS LICENSOR has published in the Federal Register of September 9, 2004, notice of its intention to grant this LICENSE under U.S. Patent No. 5,511,122 to LICENSEE and has provided the public with an opportunity for filing written objections; and

WHEREAS LICENSOR has determined that:

(A)  The interest of the Federal Government and the public will best be served by the proposed license, in view of the LICENSEE's intentions, plans, and ability to bring the invention described and claimed in U.S. Patent No. 5,511,122 to Practical Application or otherwise promote the invention's utilization by the public;

(B)  The desired Practical Application has not been achieved, or is not likely expeditiously to be achieved, under any

4

6

nonexclusive license which has been granted, or which may be granted, on the invention;

(C) Exclusive licensing is a reasonable and necessary incentive to call forth the investment of risk capital and expenditures to bring the invention to Practical Application or otherwise promote the invention's utilization by the public;

(D) The proposed terms and scope of exclusivity are not greater than reasonably necessary to provide the incentive for bringing the invention to Practical Application or otherwise promote the invention's utilization by the public; and

WHEREAS LICENSOR has not determined that the grant of this LICENSE will tend substantially to lessen competition or result in undue concentration in any section of the country in any line of commerce to which the technology to be licensed relates or to create or maintain other situations inconsistent with the antitrust laws; and

WHEREAS LICENSEE has considered the capabilities of LICENSEE to bring the invention to Practical Application and has found that the LICENSEE is a responsible party for negotiating this LICENSE on terms and conditions most favorable to the public interest and that to grant this exclusive LICENSE would be in the public interest;

NOW, therefore, in accordance with and to the extent provided by the aforementioned authorities and in consideration of the foregoing premises and of the covenants and obligations

5

hereinafter set forth to be well and truly performed, and other good and valuable consideration, the parties hereto agree to the foregoing and as follows:

## ARTICLE I

### Definitions

The following definitions shall apply to the defined words where such words are used in this LICENSE:

A. The "Licensed Patent" means U.S. Patent No. 5,511,122 entitled "Intermediate Network Authentication" issued April 23, 1996, to Randall Atkinson;

B. A "Licensed Invention" means an invention claimed in the Licensed Patent and any patents issuing thereon;

C. To "Practice the Licensed Invention" means to make, use, import, offer for sale, and sell by or on behalf of LICENSEE or otherwise dispose of according to law any machine, article of manufacture, composition of matter, or process physically embodying or made according to a Licensed Invention;

D. "Practical Application" means to manufacture in the case of a composition, product or article of manufacture, to practice in the case of a process or method, or to operate in the case of a machine or system, and, in each case under such conditions as to establish that a Licensed Invention is being utilized and that its benefits are to the extent permitted by law and Government regulations available to the public on reasonable terms;

6

27 September 2004

E. A "Royalty-Bearing Product" means any product defined by any claim of the Licensed Patent or made by a method claimed in the Licensed Patent;

F. "Net Selling Price" shall mean the invoice price of the Royalty-Bearing Product sold less all discounts and rebates actually allowed, allowances actually granted on account of rejections, returns, or billing errors, and separately billed duties, insurance, taxes, and other government or regulatory charges. A Royalty-Bearing Product will be considered to be sold when shipped or delivered to a customer or, in case of a service, will be considered to be sold when placed into service for a customer or made available to a customer for use.

G. "United States" means the United States of America, its territories and possessions, the District of Columbia, and the Commonwealth of Puerto Rico;

H. A "Grace Period" is the period after September 30 of a calendar year and before January 1 of the following calendar year; and

I. "AFFILIATE" shall mean any company, corporation, association or business in which LICENSEE owns directly or indirectly a controlling interest.

J. "SUBLICENSEE" shall mean any non-AFFILIATE granted a sublicense under Article II;

7.

27 September 2004

K. "Sublicense Income" shall mean any payments that LICENSEE or an AFFILIATE receives from a SUBLICENSEE in consideration of the sublicense of the rights granted by LICENSEE and AFFILIATES under Article X, including without limitation license fees, milestone payments, license maintenance fees, royalty fees, upfront fees, one-time royalties and other payments.

## ARTICLE II

## LICENSE Grant

LICENSOR grants to LICENSEE an exclusive right and license to Practice the Licensed Invention throughout the United States commencing on the date of execution of this LICENSE by LICENSOR, which shall become the effective date of the LICENSE, until the expiration of U.S. Patent No. 5,511,122 unless the LICENSE is sooner modified or terminated in whole or in part.

LICENSOR hereby grants to LICENSEE the right to extend the LICENSE granted hereunder to one or more AFFILIATES subject to the terms and conditions hereof, provided that the AFFILIATE is not directly or indirectly controlled by a foreign company, corporation, association, business or government.

This LICENSE is nonassignable without written approval of LICENSOR except to the successor of that part of LICENSEE's business to which this Licensed Invention pertains, provided that the successor is not directly or indirectly controlled by a foreign company, corporation, association, business or government.

23 September 2004

## ARTICLE III

### LICENSEE's Performance

LICENSEE agrees to carry out the plan for development and marketing of a Licensed Invention submitted with LICENSEE's Application for License dated August 27, 2004 and amended September 13, 2004, to bring this Licensed Invention to Practical Application one (1) year from date of execution of the LICENSE and LICENSEE will, thereafter, continue to make the benefits of this Licensed Invention reasonably accessible to the public for the remainder of the period of this LICENSE.

LICENSEE agrees that during the period of this LICENSE any products embodying this Licensed Invention or produced through the use of a Licensed Invention for use or sale by LICENSEE or its sublicensees in the United States' will be manufactured substantially in the United States.

LICENSEE shall pay to the LICENSOR a non-refundable licensing fee in the amount of twenty five hundred dollars ($2,500) payable upon the execution of this LICENSE by LICENSEE. Payment will be made in the manner prescribed in Article IV.

LICENSEE agrees to promptly report to LICENSOR any changes in mailing address, name or company affiliation during the period of this LICENSE and to promptly report discontinuance of LICENSEE's making the benefits of this Licensed Invention reasonably accessible to the United States public.

9

27 September 2004

## ARTICLE IV

### Royalties

LICENSEE shall pay a royalty to LICENSOR of three percent (3%) of the Net Selling Price for each Royalty-Bearing Product made, used, or sold by LICENSEE or its licensed AFFILIATES. LICENSEE shall also pay a royalty to LICENSOR of three percent (3%) of the Sublicensee Income. Notwithstanding the above, in no event shall any single sale or license be subjected to the payment of a royalty greater than 3% or multiple royalties of 3%.

If a Royalty-Bearing Product is distributed in whole or in part for non-cash consideration (whether or not at a discount), the Net Selling Price shall be calculated as the price of the Royalty-Bearing Product charged to an independent third party during the same royalty reporting period, or in the absence of such sales, on the fair market value of the Royalty-Bearing Product.

Non-cash consideration shall not be accepted by LICENSEE or any sublicensee for the sale of any Royalty-Bearing Product without the prior written consent of LICENSOR.

Royalties will not be paid on items sold directly to agencies of the U.S. Government or for known U.S. Government end use.

On sales made between LICENSEE and its AFFILIATES or sublicensees for resale, the royalty shall be paid on the higher Net Selling Price.

10

27 September 2004

Notwithstanding the provisions of the preceding paragraphs in this Article IV, LICENSEE agrees to pay at least a minimum annual royalty of ten thousand dollars ($10,000) for calendar year 2006, and each calendar year thereafter throughout the period of the LICENSE. The minimum annual royalty for each calendar year shall be due and payable in advance on or before September 30 of the preceding year and will be credited as advance payment of royalties to accrue during the calendar year following payment. The minimum annual royalty payments will not be refunded in whole or in part.

LICENSEE shall send to LICENSOR all royalties which accrue between January 1 and December 31 of each year by February 28 of the following year. A royalty report shall be included with each payment setting forth the quantity and Net Selling Price of each Royalty-Bearing Product sold during the period covered by the report, to whom sold and the date of such sale, and the total amount of royalties being paid for that year. Royalty reports are due each calendar year. The last royalty report is due sixty (60) days after the expiration of this LICENSE.

All payments due LICENSOR under this LICENSE shall be paid in United States dollar amounts to the DFAS-CH DSSN 8347 and mailed to:

> Office of Naval Research
> Patent Counsel of the Navy (ONR 01CC)
> 800 N. Quincy Street
> Arlington, VA 22217-5660

11

27 September 2004

with a copy of such royalty report to:

> Head, Technology Transfer Office
> Naval Research Laboratory, Code 1004
> 4555 Overlook Ave., SW
> Washington, DC 20375-5320

LICENSEE agrees to make and keep and shall require its AFFILIATES and sublicensees to make and keep full, accurate and complete books and records (together with supporting documentation) as are necessary to establish its compliance with this Article IV. Such records shall be retained for at least three (3) years following the end of the reporting period to which they relate.

LICENSEE agrees that LICENSOR may, if LICENSOR so desires at a future time or times, have a duly authorized agent or representative in LICENSOR's behalf examine all such books and records and supporting documentation either at LICENSEE's business premises or at a place mutually agreed upon by LICENSEE and LICENSOR for the sole purpose of verifying reports and payments hereunder. In conducting examinations pursuant to this paragraph, LICENSOR's representative shall have access to all records that LICENSOR reasonably believes to be relevant to the calculation of royalties under Article IV. If a royalty payment deficiency is determined, LICENSEE shall pay the royalty deficiency outstanding within thirty (30) days of receiving written notice thereof. Payments made by LICENSEE after the due date shall include interest at the annual rate of two percentage points above the

27 September 2004

Prime Rate (as reported in the Wall Street Journal for the due date) for the period of lateness. Such examination by LICENSOR's representative shall be at LICENSOR's expense, except that if such examination shows an underreporting or underpayment in excess of five percent (5%) for any twelve (12) month period, then LICENSEE shall pay the cost of such examination.

## ARTICLE V
### Patent Marking and Nonendorsement

LICENSEE hereby agrees to mark each product manufactured or sold under this LICENSE (or when the character of the product precludes marking, the package containing any such product) with the notation "Licensed from U.S. Navy under U.S. Patent No. 5,511,122". LICENSEE agrees not to create the appearance that LICENSOR endorses LICENSEE's business or products.

## ARTICLE VI
### Representation and Warranties

LICENSOR makes no representation or warranty as to validity of U.S. Patent No. 5,511,122 or of the scope of any of the claims contained therein or that the exercise of this LICENSE will not result in the infringement of other patent(s). Neither LICENSOR nor its employees assumes any liability whatsoever resulting from the exercise of this LICENSE.

13

27 September 2004

Nothing relating to the grant of this LICENSE, nor the grant itself, shall be construed to confer upon LICENSEE or any sub-licensee hereunder or any other person any immunity from or defenses under the antitrust laws or from a charge of patent misuse, and the acquisition and use of rights pursuant to this LICENSE shall not be immunized from the operation of State or Federal law by reason of the source of the grant.

Nothing contained in this LICENSE shall be interpreted to grant to LICENSEE any rights with respect to any invention other than the Licensed Invention.

## ARTICLE VII

### Reports

LICENSEE agrees to submit annual reports on or before March 1 of each calendar year on its efforts to achieve Practical Application of the Licensed Invention by one (1) year from date of execution of the LICENSE, with particular reference to LICENSEE's plan for development and marketing of the Licensed Invention submitted with LICENSEE's application for license. These reports shall contain a discussion of the actual number of staff and dollars spent during the preceding year committed to the commercialization effort. These reports shall contain information within LICENSEE's knowledge, or which it may acquire under normal business practices, pertaining to the commercial use being made of this Licensed Invention and other information which LICENSOR may

14

27 September 2004

determine is pertinent to Government licensing activities. LICENSEE agrees to submit such reports to LICENSOR until such time that the invention has been brought to the point of Practical Application.

### ARTICLE VIII
### Modification and Termination

This LICENSE may be terminated in whole or in part by LICENSOR if:

(A) LICENSOR determines that LICENSEE is not executing the plan submitted with the request for license dated August 27, 2004 and amended September 13, 2004, and LICENSEE cannot otherwise demonstrate to the satisfaction of LICENSOR that it has taken or can be expected to take within a reasonable time effective steps to achieve Practical Application of this Licensed Invention;

(B) LICENSOR determines that such action is necessary to meet requirements for public use specified by Federal regulations issued after the date of this LICENSE and such requirements are not reasonably satisfied by LICENSEE;

(C) LICENSEE willfully made a false statement of or willfully omitted a material fact in its application for license or in any report required by this LICENSE; or

(D) LICENSEE commits a substantial breach of a covenant or agreement herein contained.

15

27 September 2004

LICENSEE may terminate this LICENSE by providing a written notice of termination to LICENSOR. LICENSEE's written notice must include LICENSEE's statement that neither the LICENSEE nor its sublicensees nor any LICENSE AFFILIATES will practice the Licensed Invention in the United States after the LICENSE terminates. LICENSEE's written notice shall specify the effective date of termination.

This LICENSE may be modified or terminated in whole or in part consistent with the law and applicable regulations upon mutual agreement of LICENSOR and LICENSEE evidenced in writing and signed by both parties.

This LICENSE may be restricted to the fields of use or geographic areas, or both, in which the LICENSEE has brought the invention to Practical Application and continues to make the benefits of the invention reasonably accessible to the public. However, such restriction may be made only after the expiration of seven (7) years following the effective date of this LICENSE.

LICENSEE may request modification of this LICENSE in writing sent to LICENSOR and stating the reasons therefor.

Before modifying or terminating in whole or in part this LICENSE for any cause other than by mutual agreement, LICENSOR shall furnish LICENSEE and each sublicensee of record a written notice of intention to modify or terminate in whole or in part this LICENSE, and LICENSEE and any sublicensee shall be allowed thirty (30) days after such notice or other agreed-upon time

16

27 September 2004

period, whichever is greater, to remedy any breach of any covenant or agreement set forth in this LICENSE or to show cause why this LICENSE should not be modified or terminated in whole or in part.

LICENSEE has a right to appeal, in accordance with procedures prescribed by the Chief of Naval Research, any decision or determination concerning the interpretation, modification, termination in whole or in part of this LICENSE.

Notwithstanding the provisions of Article II, LICENSEE and LICENSOR agree that this LICENSE shall automatically terminate on September 30 of any year if the minimum annual royalty due for the following calendar year, as expressed in Article IV of this LICENSE, is not timely paid. If, however, the minimum annual royalty payment together with a surcharge of one hundred fifty dollars ($150) is paid during the Grace Period before the following calendar year, then this LICENSE shall be considered as not having automatically terminated.

ARTICLE IX

Notice

All communications and notices required under this LICENSE shall be considered duly given if sent by courier requiring signed receipt upon delivery or if timely mailed by U.S. Postal Service, first class, postage prepaid and addressed as follows: